We have four cases on the calendar this morning. But before we get to them, we have one of our Pleasant Annual Ceremonies where we welcome into our bar our departing law clerks. And I will be the movement for two of them, and George Stoll will be the movement for the third. I will begin by stating what is obligatory, which is that I move the admission of Arthur John Argyle III, who is a member of the bar and is in good standing with the highest courts of New York and New Jersey. I have knowledge of his credentials and I'm satisfied that he possesses the necessary qualifications. And I also move the admission of Yipei Audrey Yang, who is a member of the bar and is in good standing with the highest court of New York. I have knowledge of her credentials and I'm satisfied that she possesses the necessary qualifications. Beyond these obligatory statements, I want to state that these are two wonderful people. They have excellent minds. They are very diligent. They have played important roles in my chambers for the last two years. I've been privileged to have them work with me and I know they will succeed in whatever they do in life, particularly in legal practice. And I think probably we'll want to have the oath administered for all together. And so I would ask George Stoll to make her motion. OK, thank you. I move for the admission of John Yang, who is a member of the bar and is in good standing with the highest court of New York. I have knowledge of his credentials and I'm satisfied that he possesses the necessary qualifications. I'm aware of John's credentials and qualifications because he's done an excellent job serving as my law clerk for the past 15 months. John has been reliable, talented and hardworking and a joy to have in chambers. He's not only been dependable as a source for teaching difficult scientific subject matter, but also as a source for making a good strong cup of coffee. He has also demonstrated wise judgment in the selection of his fiancee. I will solicit my colleague. Shall we grant Judge Stoll's motion? I'm in favor. And will you preside over the motion that I have made? Do you approve Judge Lurie's motion? I wholeheartedly agree with Judge Lurie's motion. OK. As the presiding judge over Judge Lurie's motion, that motion is granted. Thank you. Will the applicants please approach the clerk to take the oath of office? Please raise your right hand. Do you solemnly swear or affirm that you will comport yourself in attorney and counsel at this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. I do. Welcome to the Bar of the United States Court of Appeals. Welcome. Congratulations to you all and welcome to the Bar. And I will just finally make one note that Judge Stoll and I will be participating in another ceremony regarding Audrey and John later in the year, one of much greater consequence, and I need say no more. We have four cases this morning, all patent cases, two from the Patent Board and two from the District Court. First one is Henny Penny Corporation versus Flymaster 2018-15-96. Mr. Sokol, who has been waiting patiently, poised.  I'm here representing Henny Penny, the appellant, and the petitioner, the IPR. May it please the Court, the Board made two critical errors in this case, among others. First, it erroneously considered the obviousness of only physically substituting the censor of Iwaguchi for the censor of Kaufman, and its reasoning was that that was the only thing that the petition argued. But the petition clearly argued more than that. And that is that it would be obvious to use Kaufman or another censor in Kaufman that measures TPMs because Iwaguchi teaches that it's desirable to use TPMs to accurately and most efficiently measure the oil degradation in a fryer system. I have two questions for you. First of all, what is the standard of review that would apply to this question? I mean, it seems to me it's a waiver issue, and so, therefore, abusive discretion would be the standard that we would apply. Well, this Court has said in the Erickson case that it is an abusive discretion standard. I think that's really questionable because it's tantamount to, in district court, which would be a motion to dismiss that is reviewed de novo. But under the present law in this Court, it is an abusive discretion standard. And then my second question to you is, where is it that the reference says that the measuring of TPMs is efficient? Because I don't think the reference actually says why you would want to do it. Paragraphs 3 and 4 of Iwaguchi, Your Honor. And I can read you that language. This is in the appendix at 715, and I'll just read the pertinent parts of paragraphs 3 and 4. Paragraph 3, known standards of analytical values of such oils and fats include acid value, peroxide value, and polar compounds. And, in fact, Kauffman uses peroxide and acid values. It also discloses polar compounds, but not expressly in connection with friar oil. Paragraph 4 says. Mr. Sokol, combining Kauffman and Iwaguchi has certain problems, which the board recognized, relating to temperature, right? Is that substantial evidence supporting its decision? No, I don't think so, Your Honor. First of all, the cooling means are not part of the censor. And I'm sorry, I didn't. But you can read paragraph 4, which talks about, really talks about safety. And that it's the gold standard in most of Europe, because the other two parameters are inferior and have serious problems. So that's really the motivation. And Judge Lurie, yeah, the problems. The problems were in connection with physical substitution of one censor for the other. That didn't address the broader argument that this very strong motivation that you get from paragraphs 3 and 4 of Iwaguchi, to use TPMs and not peroxides and acids, has no impact on that whatsoever. And even physical substitution would have been obvious. There's a very high level of skill in the art in this case, which was not even contested by Freymaster. What about the secondary considerations? There was praise in the industry, awards? There is evidence of praise. And the case law of this court has said that when you have pretty strong evidence of obviousness, and here I maintain it's overwhelming, that the secondary evidence of praise is just about the weakest you can have. Even the board here found that there was no substantial need, unfilled need, for the invention, the claimed subject matter, because it was satisfied by Iwaguchi and Kaufman. And the praise is not really, it doesn't even have a nexus, because the things that were praised are in both Iwaguchi and in Kaufman. And this court has said that you don't satisfy the nexus requirement if the thing that's being praised, or whatever the secondary consideration is, is found in the prior art. When the patent owner response explained how there would be all kinds of drawbacks and complexity in making the proposed combination contained in the petition, on reply, did you supply any kind of evidence or expert declaration that would explain why, that would explain away whatever combinability problems related to complexity or anything else that's untrue? Your Honor, again, the complexity went just to the physical substitution, and it was cooling means. The cooling means are not part of the censor, so you could substitute the censor. But obviously, your combination to work and operate requires to compensate for the high, high heat that's now going to be used against Iwaguchi's censor. And so your counterargument, I understand as well, you could just use a heat dissipator to deal with that. And you don't believe that it's as complex as the patent owner is making that out to be. So what I'm trying to figure out is, did you supply an expert declaration or any evidence to that effect? I think the answer is no. Well, we have an expert declaration. That was attached to the petition. I'm asking about attached to your reply or anything else. Neither party has any evidence along those lines. It's pure, conclusive speculation by both experts. But the cooling means is not part of the censor. Kaufman has a censor that goes all the way up to 400 degrees centigrade. The operating temperature for the fryer is only 186 degrees centigrade. The references have overlapping temperature ranges. Even Iwaguchi says that you can use his censor at 180 degrees centigrade. He just prefers a lower temperature. It's not a requirement. He prefers a lower temperature to enhance the life of the censor. But he never says that it's necessary. In fact, he doesn't even mention the cooling means until Claim 6 of Iwaguchi. And he doesn't even describe it until the 15th paragraph of the reference. And none of that takes away from, it all goes to the physical substitution. If the board was wrong in saying that the petition is limited to physical substitution, then the obviousness couldn't be clearer. You've got Kaufman who measures conductivity and detects polar materials, but in connection with oils that there's leakage from a cooling system that is polar, and it raises the conductivity of the oil. And then you've got Iwaguchi who says the acid values and peroxides that Kaufman says you can use in fryer systems are inferior. They have problems. They don't work. And people could get arteriosclerosis and heartburn and serious diseases. But TPMs, it says, is the gold standard in most of Europe. And that's why you need to use TPMs when you're talking about fryer systems rather than other kinds of oil. And the motivation could not be stronger. But even physical substitution, I argue, would have been obvious, although the board was erroneous in limiting it to that as the issue. Because one of ordinary skill in the art could use the censor of Iwaguchi. And in fact, the board relied on a single sentence in paragraph 250 of Bowser's declaration and the same language is in the petition that said you can use a censor in Kaufman that detects TPMs. And then he says in paragraph 250, you can use the censor for greater accuracy and for most efficiency. The processor and or censor of Iwaguchi. Well, processor and or censor means you can use the processor alone. Iwaguchi has a sensor and a processor and the sensor detects conductivity and the processor converts the conductivity into TPMs. Kaufman also has a sensor that measures conductivity and he even says it detects polar materials. And if you physically substitute the processor, which that one sentence in paragraph 250 says, if you physically substitute just the processor and not the sensor of Iwaguchi, then you have it. Because that processor, both experts on both sides testified that Kaufman's conductivity measurement is indicative of TPMs. And if you use a processor that calculates TPMs from conductivity, that would have been an obvious physical substitution. How do you respond on the waiver issue? How do you respond to the testimony that was pointed out or I shouldn't say testimony, but the oral argument discussion that occurred at the PTAB where the PTAB judges repeatedly asked in the petition, what was your position? And the response reads to me as if they're saying it was just a swap. Why isn't that enough to support the board's reading of the petition and determination that any other kind of combination was waived? Okay, it's not a waiver because the petition speaks for itself. I've explained why the petition has the broader obviousness argument. And yet when the attorney at the board hearing was asked point blank about where is this argument, this broader argument about combining these two references, the attorney was only referring to his reply brief, not the petition. And the board circled back to that and confirmed with the attorney, it's just in the reply, right? And the attorney said yes. So at this point, what are we supposed to do with that in trying to, I don't know, resurrect something kind of cryptic in the petition when it appears to have been given away at the hearing? Well, it couldn't be waived at the hearing because it's in the petition and he argued both at the hearing. He argued both obviousness positions, substitution and the broader alternative argument. So he wasn't waiving at the oral argument because he actually made that argument. The petition, as I said, speaks for itself. And all he was, I mean, he made ambiguous statements. He clearly made some statements that he didn't have to make. But the court should view with skepticism that there is a gratuitous waiver of something that's actually in the petition. The board itself cited the response to the petition where it said there was no accuracy mentioned anywhere in Iwaguchi. And that put the whole Iwaguchi disclosure into play. And Mr. Sokol, you're just about through your time, including rebuttal. Why don't we hear from the other side and we'll give you two minutes of rebuttal time. Thank you, Your Honor. Mr. Loy. Good morning, Your Honors. May it please the court. Joseph Loy on behalf of Frymaster. What we've heard this morning, and what is evident from the briefs before this court, is that the appellant is trying to rehash factual determinations that were made by this board in a well-reasoned 39-page opinion that walks through from the premise of the petition that one would substitute the censors of Iwaguchi within the system of Kauffman to reach the 691 claim patent. And by doing that, it walks through the arguments on motivation combined, the evidence presented on motivation combined, and additionally, the evidence on the secondary considerations. These references were pretty close, though. Whether the references were pretty close is not the question before this court. Just one switch. One change. Judge Loy, the question before this court is the question that the board did interpret, using the KRS standard, also using this court's precedent. KSR? Pardon me, Your Honor. Can you speak about paragraphs three and four of Iwaguchi? Sure. And explain away why what Mr. Sokol is pointing out is wrong? The paragraphs in Iwaguchi that refer to why one would use TPM were analyzed by the board. That is a factual determination that is well within the discretion of the board, and the board looked to those facts in addition to larger facts. Can you go dig down a little deeper than that? I know the board addressed it, but I'm trying to understand what's the content of these two paragraphs in Iwaguchi. Sure. There is an argument that it's saying acid value, peroxide value, those aren't as reliable as what it wants to look at, TPMs. So even if we took that as true, we move then to— It says what it says. It says what it says, and we're not trying to reread the paragraph, but what we are doing and what we did before this court is we presented evidence that the reference as a whole, looking at Iwaguchi in its entirety, and the problems that Iwaguchi was confronting, even when the goal was to use TPM as its mechanism for determining oil degradation, it then took a Friar system and inserted a diversion cooling sampling loop. And in that loop, for numerous reasons, you have oil cooled using a dissipator. The cooled oil is cooled for a reason. Let's just stick with paragraphs three and four. I mean, you're talking about something else now. Paragraphs three and four appear to be communicating that measuring TPMs is a better way of detecting the degradation of cooking oil than measuring for these other values. Those values are what, in fact, is what Kaufman is measuring. So am I misreading paragraphs three and four when I see it communicating that to me? I think it is important that you read, Judge Shen, the entirety of the reference and not just those passages in isolation. Okay, well how about those passages in isolation? Am I reading them correctly when I say what I said? What we are not disputing is that the paragraphs read precisely what they say. Okay, so then what else in the reference when you say, let's read Iwaguchi as a whole, that Iwaguchi somehow walks away from what it communicated in paragraphs three and four? The point is not necessarily that it walks away. The paragraphs are there. It says if we're going to use this as an approach, which is we're going to measure total polar material, this is the system that will achieve that result. In this system, it is clear as day in this representation that you have to lower the temperature in order to not expose the oil to prolonged periods of heat, which will degradate the oil. To cool the oil such that the sensor itself, which is measuring TPM, is not being exposed to scalding hot oil to damage the sensor. Also, to ensure that you're getting within the temperature range that is prescribed by the conversion table, that you're not outputting an error message. So all of those statements in Iwaguchi are statements that the board considered in the totality when they were considering the petitioner's argument that one would do the substitution. Now, the argument we heard from the petitioner again and again is one could, but that is not the question before the board or this court. It is whether one would be motivated and one would expect to achieve results out of that. And the board itself determined that that was not fact. And this court, as a court of review of those factual findings, owes deference to the findings of the board. Now, we agree with our friends on the other side, to Judge Spill's question, that on the waiver issue, that this is an abuse of discretion standard. There is no doubt about that. And the board was well within its discretion under the requirements of 312 that the petition must set forth with particularity the basis for the grounds on which it is moving. This board determined that that was a substitution argument, and the petitioner again and again affirmed those results. And in its well-reasoned opinion, reached its conclusions. How do you respond to the point that the petition stands on its own and that we should just look at the petition? And the language in the petition is more debatable as to whether it's proposing an actual substitution. Do you think the board should be able to ask counsel what the petition says and have that be held against counsel? I think that the board is charged, under the statute, to determine what is in the petition. And the predicate of that is that the petitioner must factually state forward in an articulate and in specific means what not only its arguments are, but what evidence it has to support that. And then when the board is issuing its institution decision, the board has the obligation to explain why it's instituting, which this board did with clarity. And although the petitioner sought rehearing on the institution decision, it did so on grounds one through five, not ground six, which is the ground that was instituted on. So there was no point at which, in that rehearing motion, that the petitioner contended that the board got it wrong there. And then when it became apparent that the petitioner was trying to inject new arguments that had not been made or that were not instituted on, they confirmed repeatedly on this record that the position that the board took was the correct one. And that should be affirmed because that certainly was not an abuse of discretion, Your Honor. And I'll take Judge Lurie's advice from yesterday that you'll never lose points from conceding time unless this board has any additional questions for me. I will surrender the rest of my time. Thank you, Counsel. Mr. Sokol has a couple of minutes of rebuttal time. I'm sorry, Your Honor. You have a couple of minutes of rebuttal time if you wish to utilize them. Yes, Your Honor. Okay. So my opponent said that the petition said could rather than would. If you read all of the paragraphs in context, 246, I'm talking about Appendix 883 and 884 of the Declaration of Bowser, 246 said that sensors capable of measuring data indicative of total polar materials are known in the prior art. Those skilled in the art could readily adapt such sensors for use in Kaufman's system. But then he explained why they would want to. In fact, he said could if they desired to measure total polar materials. You're quoting from the declaration, not from the petition. The same language appears in the petition, Your Honor. The petition says could have modified the Kaufman system. The petition is at Appendix 99 to 100. Right. You'll find the same language. I see, could have. Right, could have. If desired to measure total polar materials. And then paragraphs, the subsequent paragraphs show why one would have wanted to or desired to measure total polar materials and therefore would have readily adapted the sensor to measure total materials. The board focused just on one single sentence instead of reading these in context. So, in 248, Iwaguchi provide, and I'm writing the declaration, Iwaguchi further provides for detecting the amount of polar compounds for the purpose of estimating the degradation state of cooking oil. Thus, one skilled in the art would, would have understood that it was desirable in the field of cooking oil quality to provide a sensor that evaluates total polar compounds to most efficiently accomplish this task. That's an argument of general obviousness. Mr. Sokol, I want to ask you another question, which is earlier you had directed us to paragraphs three and four of the reference, but is that, I don't see that part of the reference being cited in the petition. Am I missing that? The reference cites Iwaguchi. It doesn't cite. It doesn't say where to look. It doesn't rely on paragraphs three and four for motivation to combine. Instead, it relies on the notion that it would be more accurate. More accurate and more efficient, yes. And the reason, the basis for that is what's in paragraphs three and four. How does the board know that the basis for that is what's in paragraphs three and four if it's not identified in the petition? It is not cited expressly in the petition. If you read Iwaguchi, then you'll see that that's where it is. This is just like the Erickson case, where this is just an expansion, Erickson versus Intellectual Ventures Roman numeral I, where the court remanded because the board refused to consider an argument saying it wasn't in the petition. And this court said that was error because it was essentially the same thing that was raised later on. There was no new reference that had a significantly different point, and that it was simply an expansion that was permissible that the board had to permit. Thank you. Thank you, Mr. Sokol. As you can see, your time has expired. The case is submitted. Okay. Thank you, Your Honor.